**James MEE, Appellant,**

v.

**SAFECO INSURANCE COMPANY OF AMERICA, Appellee.**

Superior Court of Pennsylvania.

Argued April 25, 2006.

Filed Sept. 14, 2006.

Thomas M. Marrone and Joseph A. Zenstein, Philadelphia, for appellant.

Charles E. Leasure, III, Philadelphia, for appellee.

BEFORE: HUDOCK and PANELLA, JJ. and McEWEN, P.J.E.

OPINION BY HUDOCK, J.:

¶ 1 In this class action suit for breach of contract and bad faith, James Mee (Mee) appeals from the order granting summary judgment to Safeco Insurance Company of America (Safeco). Finding that the trial court misapplied this Court's holding in *Gilderman v. State Farm Insurance Com-*

*pany*, 437 Pa.Super. 217, 649 A.2d 941 (1994), we reverse and remand for further proceedings.

¶ 2 Mee purchased a homeowner's insurance policy from Safeco covering his home at 4540 Garland Road, Bensalem, PA 19020, with an effective date of August 29, 2001, to August 29, 2002. The policy provided replacement cost coverage, but also allowed for the possibility of loss settlement based on actual cash value. The policy defines actual cash value as follows: "When the damage to property is economically repairable, *actual cash value* means the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration and obsolescence." Policy Definitions, page 20, at ¶ 1(a).

¶ 3 On May 20, 2002, Mee suffered direct physical loss to his home as the result of an overflowing toilet. Mee reported the loss to Safeco the same day. On May 23, 2002, Safeco sent a general contractor, First General/Lewis Builders, Inc. (Lewis Builders), to inspect the damage to Mee's home and to provide Safeco with a repair and replacement cost estimate. Lewis Builders submitted an estimate to Safeco of $3,892.38. This estimate **did not** include a line-item cost for a general contractor's overhead and profit (O & P). Safeco also hired John Dwyer of ComSearch (ComSearch) to conduct an adjuster summary of Lewis Builders' estimate. ComSearch concluded that the cost of repair to Mee's home was $3,368.83, a difference of $523.55 from Lewis Builders' estimate.[1] Meanwhile, Mee hired a public adjuster, John Hansen, to inspect the damage and to provide a repair and replacement cost estimate. Using his own esti-

---

1. The significance of the $523.55 difference, which ComSearch designates "Adjusted Amount," is not clear from a review of Lewis Builders' and ComSearch's estimates. However, a handwritten notation on a copy of the cover letter accompanying Safeco's payment to Mee *et al.*, dated July 22, 2002, suggests that this amount represents a deduction for O & P.

mate, John Hansen submitted a proof of loss form to Safeco on behalf of Mee in the amount of $7,112.09. The major difference between John Hansen's estimate and Com-Search's estimate was the cost of replacing the hardwood floor in Mee's family room.

¶ 4 On July 22, 2002, Safeco issued a check in the amount of $2,284.15 to Mee and his wife and John Hansen. This amount purportedly represented the cost of repairs, less Mee's $500.00 deductible and twenty percent for O & P.[2] Mee accepted the check as "partial settlement" of his claim. Then, in a letter from John Hansen to Safeco dated December 11, 2002, Mee presented a claim for twenty percent O & P based on the repair and replacement cost estimates. Safeco sent a letter on December 17, 2002, offering Mee O & P with regard to the unresolved flooring issue *only* and requesting that Mee provide the name of the general contractor who would be doing the repairs, as indication that Mee would incur an O & P expense. Mee did not respond to Safeco's request.

¶ 5 On May 19, 2003, Mee filed suit against Safeco alleging breach of contract, insurance bad faith under 42 Pa.C.S.A. section 8371, and violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. sections 201–1– 201–9.3. As noted, Mee brought this suit as a class action on his own behalf and as the representative of a class of similarly situated homeowners in Pennsylvania. Safeco's preliminary objection to the UTPCPL claim was sustained on December 18, 2002. Following discovery, Safeco filed a motion for summary judgment on December 1, 2004, to which Mee respond-

ed on December 29, 2004. Then, on February 14, 2005, Safeco filed a joint motion for summary judgment along with several other defendants in separate, related cases. The trial court granted summary judgment to Safeco on June 15, 2005. This appeal followed.

¶ 6 Mee asks us to review the following questions:

1. Did the trial Court commit error when it granted summary judgment in favor of the defendant insurance company, even though the record contained expert custom and usage evidence that whenever more than one trade is reasonably required to make repairs, a general contractor's services (with the contractor's overhead and profit) are reasonably required?

Does Safeco's' [sic] homeowners insurance policy, together with relevant custom and usage, require that Safeco automatically and unconditionally pay, to a property damage claimant, general contractor's overhead and profit whenever more than one construction trade is reasonably required to make the repairs or restoration?

Mee's Brief at 4. These questions challenge the trial court's grant of summary judgment based on its finding that Safeco was not required to pay O & P to Mee because he did not use a general contractor to repair the damage to his home.

Our scope of review of an order granting summary judgment is plenary. We apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a

2. Given our inability to reconcile the amount paid by Safeco to Mee ($2,284.15) with either ComSearch's or Lewis Builders' estimates, *less O & P and a $500.00 deductible, we are troubled by the possibility that Safeco with-

held O & P which, Safeco admits, was not included in the original defense estimates, thereby further reducing the insurance proceeds paid to Mee.

genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. All doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party.

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of her cause of action. Summary judgment is proper "if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2. In other words, "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense, which could be established by additional discovery or expert report and the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. *Id.* Thus, a record that supports summary judgment either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense.

Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate [c]ourt will disturb the trial court's order only upon an error of law or an abuse of discretion.

Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

Where the discretion exercised by the trial court is challenged on appeal, the party bringing the challenge bears a heavy burden.

It is not sufficient to persuade the appellate court that it might have reached a different conclusion if ... charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Chenot v. A.P. Green Services, Inc.,* 895 A.2d 55, 60–62 (Pa.Super.2006) (internal quotations and most internal citations omitted).

¶ 7 At the heart of the present dispute is conflicting interpretations of this Court's decision in *Gilderman v. State Farm Ins. Co.,* 437 Pa.Super. 217, 649 A.2d 941 (1994). According to Mee, *Gilderman* stands for the proposition that, in any claim where more than one trade is required to perform the repairs, it is "reasonably likely" that the services of a general contractor will be required and, accordingly, the insurance company must include O & P as part of its actual cash value payment, even if the insured makes

the repairs himself, hires a handyman instead of a team of subcontractors, or chooses not to make the repairs at all. Mee's Brief at 15, n. 8, and 17. Safeco, on the other hand, interprets *Gilderman* as imposing a requirement that an insurer look at the facts of each case in making its determination of whether the use of a contractor is reasonably likely. Because Mee did not hire a general contractor but did the work himself, Safeco argues, use of a general contractor was not reasonably likely, and, therefore, Mee was not entitled to O & P. Safeco's Brief at 8. The trial court agreed with Safeco, finding that Mee did not hire a general contractor; therefore, "[t]he use of a general contractor was never 'reasonably likely' because no general contractor was needed." Opinion, 11/28/05, at 4. Both these interpretations miss the mark. Consequently, because the trial court misapplied our decision in *Gilderman*, it committed an error of law.

■ ¶ 8 The Honorable John Hester stated the issue in *Gilderman* as "whether an insurer, which has agreed to pay repair or replacement costs less depreciation in advance of actual repair or replacement of a covered loss, may automatically withhold both depreciation and a flat twenty percent representing contractor overhead and profit from its advance payment." *Gilderman*, 649 A.2d at 942. Tailoring the *Gilderman* issue to fit the case at hand, the question becomes whether an insurer, which has agreed to pay actual cash value in advance of the repair and replacement of a covered loss, is required to include twenty percent for O & P in its advance payment where no general contractor was used because the homeowner made the repairs himself. The answer to that question depends on whether use of a general contractor was reasonably likely. Whether use of a general contractor was reason-

ably likely is a question of fact for the jury.

¶ 9 Like the case at hand, *Gilderman* involved a replacement cost coverage insurance policy. Therein, the homeowner instituted a class action alleging that, since January 1, 1991, State Farm always deducted twenty percent from the top of its repair or replacement estimates for purposes of computing the actual cash value of a loss. *Gilderman*, 649 A.2d at 944. The homeowner argued "that contractor overhead and profit must always be included in repair or replacement cost estimates [because repair or replacement costs necessarily include contractor overhead and profit]. State Farm counter[ed] that contractor overhead and profit never has to be included in repair or replacement cost estimates since contractors are not always used to repair or replace damaged property." *Id.* at 944.

¶ 10 Before addressing the parties' arguments, Judge Hester made an initial observation: "Repair and replacement costs logically and necessarily include any costs that an insured *reasonably would be expected to incur* in repairing or replacing the covered loss." *Gilderman*, 649 A.2d at 945 (emphasis supplied). Turning to the homeowners' claim that repair or replacement costs estimates "necessarily" include twenty percent for a general contractor's overhead and profit, Judge Hester opined:

We believe that there clearly are certain types of property damage claims which will not require the services of a general contractor. An example is where the loss involves only a damaged pipe, and a plumber alone normally would be called to perform all necessary repairs. In this respect, we therefore agree with State Farm's position that there are some types of covered losses where the services of a general contractor normally would not be utilized. Thus, *in some*

*cases*, contractor expenses would not have to be included in repair or replacement cost estimates.

Indeed, [Gildermans] implicitly concede that general contractors are not always needed, noting that "it is generally accepted in the building trade that if *more than three trade categories* of subcontractors are involved in the repairs, the owner is entitled to the services of a general contractor to obtain bids, hire the subcontractors and coordinate/supervise the work."

On the other hand, however, there are types of property damage where a homeowner would use the services of a general contractor. There are many instances where the insured reasonably would be expected to call a contractor, especially *where there is extensive damage to a home* [emphasis supplied] requiring the use of more than one trade specialist. Thus, State Farm may not make repair or replacement estimates and then deduct twenty percent representing contractor's fees when those expenses reasonably are expected to be incurred.

*Id.* Based on this reasoning, Judge Hester rejected the homeowners' argument that O & P must *always* be included in repair and replacement cost estimates.

¶ 11 Judge Hester then addressed State Farm's reasons for always deducting O & P from its advance payments:

State Farm defends its actions first by observing that a contractor's costs are contingent and may never be incurred. State Farm posits that it is unfair for an insured to receive advance payment for such expenses. We make two observations in regard to this argument. First, contractor expenses may well be contingent; however, the same can be said of all repair or replacement costs. For example, the insured may be a plumber,

repair a covered loss himself, and incur no labor costs. The insured may be able to obtain goods at wholesale, used, or free and never incur the retail cost of parts. All repair and replacement costs are, in theory, "contingent" prior to being incurred.

Second, and more importantly, the issue is not whether a given cost is contingent. *The issue is what State Farm agreed to pay to its insureds prior to actual repair or replacement.* It agreed to pay "actual cash value," which means "repair or replacement cost less depreciation." Thus, the real inquiry is what is included in "repair and replacement costs." We hold that repair or replacement costs include *any cost that an insured is reasonably likely to incur in repairing or replacing a covered loss.* In some instances, this will include use of a general contractor and his twenty percent overhead and profit.

*Gilderman*, 649 A.2d at 945.

¶ 12 Like State Farm, Safeco complains that, because Mee did not use a general contractor, he did not incur an O & P expense; therefore, paying him O & P would result in a windfall. The trial court expressed the same concern. Opinion, 11/28/05, at 4 ("The purpose of insurance is to cover a loss, not to create financial windfalls …"). Judge Hester addressed this issue:

State Farm offers a second rationale for its practice [of never including O & P], arguing that an insured would receive a windfall if permitted to recover a repair or replacement cost which may never be incurred. In this respect, we note that insureds under these policies have paid an additional premium for replacement cost coverage so that the insured can afford to repair or replace a loss at current market value and essentially keep the value of his property the

same.... It can hardly be said that an insured reaps a windfall by obtaining payment of actual cash value determined in a fair and reasonable manner when that is precisely what the insurer has agreed to pay under its policy in advance of actual repair or replacement. *Gilderman*, 649 A.2d at 946. According to Judge Hester, no windfall occurs where the insured receives benefits for which he has paid and to which he is entitled, even if repair or replacement costs are not incurred. *Id.*

¶ 13 In *Gilderman*, Judge Hester did not adopt a bright line rule for determining when an insurer should pay O & P based on the number of trades required to make repairs. Rather, Judge Hester established an objective standard by which an insurer may determine on a case-by-case basis whether to pay O & P, *i.e.*, payment of O & P is required where use of a general contractor would reasonably be likely. Judge Hester suggested certain factors to be considered in reviewing the insurer's decision regarding payment of O & P, *i.e.*, the extent of the property damage, the number of trades required to repair the damage, and expert evidence of building industry standards regarding the correlation between use of a general contractor and the number of trades required to repair damage. *Gilderman*, 649 A.2d at 945.

■ ¶ 14 From *Gilderman*, we take the following legal principles: (1) actual cash value includes repair and replacement costs;[3] (2) repair and replacement costs include O & P where use of a general

contractor would be reasonably likely; (3) because a homeowner pays higher premiums for repair and replacement coverage, he is entitled to O & P where use of a general contractor would be reasonably likely, even if no contractor is used or no repairs are made; (4) expert testimony about industry standards may be used to answer whether use of a general contractor is reasonably likely; and (5) whether use of a general contractor is reasonably likely depends on the nature and extent of the damage and the number of trades needed to make repairs. This last principle necessarily requires consideration of the degree of coordination or supervision of trades required to make the repairs.

¶ 15 Herein, the record establishes the following: (1) Mee paid premiums for a full value repair and replacement policy; (2) Mee suffered a covered loss; (3) Safeco agreed to pay Mee the actual cash value for repairs and replacement; (4) multiple trades would be needed to repair the damage to Mee's bathroom, stairwells, family room, and foyer, *e.g.*, plumbing, flooring, drywall, carpentry, painting, and electrical; and (5) Mee presented expert opinions as to when use of a general contractor is reasonably likely.

■ ¶ 16 Applying the *Gilderman* principles to this case, Mee is entitled to the benefit for which he contracted with Safeco, *i.e.*, O & P, if he can establish that use of a general contractor would be reasonably likely; the fact that Mee chose to—or was required to—make the repairs himself does not necessarily preclude him from recovering O & P. Viewing the evidence in the light most favorable to Mee as

**3.** We are aware of this Court's recent decision in *Kane v. State Farm Fire and Cas. Co.*, 841 A.2d 1038 (Pa.Super.2003) (involving State Farm's practice of deducting depreciation from insureds' settlements for partial loss claims), which rejects the definition of actual cash value originally stated in *Canulli v. All-*

*state Ins. Co.*, 315 Pa.Super. 460, 462 A.2d 286 (1983), and relied upon in *Gilderman* as non-binding dictum. *Kane*, 841 A.2d at 1046. Our use of "actual cash value" in the present case neither contradicts the definition set forth in *Kane* nor undermines our interpretation of or reliance on *Gilderman*.

the non-moving party, we conclude that a genuine issue of material fact exists as to whether use of a general contractor would be reasonably likely under the facts of this case. We further conclude that a genuine issue of material fact exists as to whether Safeco acted in bad faith by not paying O & P on Mee's claim. Because resolution of these questions is for a jury, the entry of summary judgment in favor of Safeco was improper. Thus, we remand for further proceedings.

¶ 17 Order reversed and case remanded for further proceedings. Jurisdiction relinquished.